C. Moze Cowper (CA Bar No. 326614)
COWPER LAW LLP
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707
mcowper@cowperlaw.com

Annie McAdams (*to appear pro hac vice*)
ANNIE MCADAMS PC
2900 North Loop West, Suite 1130
Houston, Texas 77092
Tel.: (713) 785-6262
annie@mcadamspc.com

Bryan Blevins (*to appear pro hac vice*)
PROVOST UMPHREY LAW FIRM
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 835-6000
bblevins@pulf.com

*Attorneys for Plaintiff, Jane Doe, (M.S.H.)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE (M.S.H.), an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MARRIOTT INTERNATIONAL, INC. D/B/A COURTYARD BY MARRIOTT, and W2005/FARGO HOTELS (POOL A) REALTY, L.P.,<br><br>Defendants. | Case No.: **'24CV2050 WQHDDL**<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (M.S.H.), by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

## SUMMARY

1.     Jane Doe (M.S.H.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.     Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.     Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

2

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or should know engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (M.S.H.), with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including Jane Doe (M.S.H.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the Courtyard by Marriott located at 530 W Rancho Vista Blvd, Palmdale, California 93551 ("Palmdale Courtyard" or "Subject Hotel"). Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9. Jane Doe (M.S.H.) is a natural person who is currently a resident and citizen of Idaho.

10. Jane Doe (M.S.H.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (M.S.H.)

12. Marriott International, Inc. d/b/a Courtyard by Marriott ("Marriott International") is a Delaware corporation with its principal place of business located

3

at 7750 Wisconsin Avenue, Bethesda, Maryland 20814. It can be served by its registered agent Amanda Garcia, 330 N. Brand Blvd, Glendale, CA.

13. Defendant MIF, L.L.C., a/k/a Marriott International Franchising, L.L.C., is a Delaware limited liability company with its principal place of business located at 7750 Wisconsin Avenue, Bethesda, Maryland 20814. It can be served by its registered agent Amanda Garcia, 330 N. Brand Blvd, Glendale, CA. It is a wholly owned subsidiary of Marriott International and Marriott International is its sole member.

14. Upon information and belief, MIF is the franchisor of select Marriott locations, including those located in California.

15. All franchised Courtyard hotels are part of a single system whether the franchisor is Marriott International or MIF, and all franchisor obligations are performed by Marriott International, MIF, and their affiliates.

16. Marriott International and MIF will be referred to collectively as "Marriott."

17. At all relevant times, Marriott owned, operated, controlled, and/or managed the Palmdale Courtyard.

18. All references to Marriott include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Marriott, now or at any time relevant to the claims herein.

19. Defendant W2005/FARGO HOTELS (POOL A) REALTY, L.P. is a Delaware corporation that, during the period at issue, owned, operated, controlled, and/or managed the Palmdale Courtyard through the Marriott franchising system. W2005/FARGO HOTELS (POOL A) REALTY, L.P. can be served through its

4

Registered Agent, Amanda Garcia, 330 N. Brand Blvd, Glendale, CA. W2005/FARGO HOTELS (POOL A) REALTY, L.P. will be referred to herein as "Marriott Franchisee," "Franchisee" or "Franchisee Defendant."

20.    All references to Marriott Franchisee include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Marriott Franchisee now or at any time relevant to the claims herein.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 139 because all Defendants are residents of this District and of California for purposes of venue under 28 U.S.C. §§ 1391(c).

23.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

24.    Jane Doe (M.S.H.) was trafficked in this District.

## FACTS

**I.    Jane Doe (M.S.H.) is a Survivor of Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

25.    Jane Doe (M.S.H.) is a survivor of sex trafficking. Her trafficking began in approximately 2013 and continued through 2015. Jane Doe (M.S.H.) had one trafficker in the years she was trafficked.

26.    Her trafficker controlled her through physical violence, drugs, and a fraudulent romantic relationship. He forced her to engage in commercial sex acts for his financial benefit. Her trafficker beat her repeatedly leaving visible bruises on her body.

27.    Her trafficker posted advertisements of her for commercial sex services online without her consent.

28.    She did not want to engage in commercial sex acts but when she tried to leave, her trafficker beat her and forced her to take drugs. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (M.S.H.) to believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for their financial benefit.

29.    Her trafficker told her that if she did not do what he wanted, he would hurt her and her family.

30.    Jane Doe (M.S.H.) was not allowed to keep any of the money she made.

31.    Jane Doe (M.S.H.) was repeatedly trafficked at the Palmdale Courtyard and each Defendant facilitated her trafficking.

32.    Between 2013 and 2015, Jane Doe (M.S.H.) was continuously trafficked. Specifically, throughout this period Jane Doe (M.S.H.) was repeatedly and regularly trafficked at the Palmdale Courtyard.

33.    Jane Doe (M.S.H.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] Specifically, she had obvious signs of fear and nervousness in her demeanor, she showed apparent effects of the drugs used to control her, and she had visible injuries

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

from the violence she endured. These effects were obvious and apparent to the staff and management of the Palmdale Courtyard including effects on Jane Doe (M.S.H.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that Jane Doe (M.S.H.) was being continually subjected to coercion, control, and exploitation.

34. Jane Doe (M.S.H.) remained under the continuous control of her traffickers through at least 2015.

**II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

35. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, including the Palmdale Courtyard, and the trafficking of Jane Doe (M.S.H.).

36. Sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of the commercial exploitation of children.[7]

37.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Marriott and Franchisee, on best practices for identifying and responding to sex trafficking.

38.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

39.    This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission.          End          Human          Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf    (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

40. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[9] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;

---

[9] *See id.*

9

- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

41. The organizations who developed these "red flags" then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff.[10]

42. Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[11] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

---

[10] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

[11] *See id.*

10

- individuals lack identification;

- car in the parking lot is parked so license plate is not visible;

- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

- individual appears to be giving scripted responses.

43.    Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[12] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

44.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff

---

[12] *See id.*

11

in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

45. Before Jane Doe (M.S.H.)'s trafficking at the Palmdale Courtyard, Marriott and Franchisee were educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, Marriott and Franchisee acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

46. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

47. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of a commercial sex act. Today, Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association

---

[13] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[14] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[15]

48.    Marriott and Franchisee were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

49.    Marriott and Franchisee were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves sex trafficking. Marriott and Franchisee received training and guidance on this. Marriott and Franchisee knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong and that reasonable diligence required treating signs of commercial sex activity as evidence of sex trafficking. Reasonable diligence required Marriott and Franchisee to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Marriott and Franchisee were thereby benefiting from the harboring of sex trafficking victims.

50.    The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of

[15] *Id.*

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

13

indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

51.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

52.    Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

53.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to

[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

54. Marriott and Franchisee each had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

55. Unfortunately for Jane Doe (M.S.H.), Marriott and Franchisee failed at all levels to respond appropriately to their knowledge of the prevalence of widespread and ongoing sex trafficking in their hotels. Instead, Marriott and Franchisee have continued financially benefiting by providing venues for the trafficking of victims like Jane Doe (M.S.H.).

**III. Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.**

56. Defendants' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Marriott and Franchisee have known, since well before Jane Doe (M.S.H.)'s trafficking, that sex trafficking was ongoing and widespread at Marriott properties, including the Palmdale Courtyard.

**A. Sex Trafficking at Marriott Branded Hotels was Well Known.**

57. Use of Marriott branded properties for sex trafficking is well known to Marriott and Franchisee.

58. At all relevant times Marriott has adopted a centralized approach to trafficking-related issues at all its branded properties. It has engaged in partnerships with organizations on behalf of its hotels, controlled training of hotel employees and adoption of relevant policies and procedures, and has publicly acknowledged its

assumption of responsibility to respond to sex trafficking its hotels, noting: "[i]t is an unfortunate reality that traffickers sometimes use hotels to exploit victims and commit their crimes. But rather than wish it were otherwise, we decided to make our 6,000-plus properties worldwide part of the solution."[19] Marriott's leadership has also publicly touted its success in doing so. Marriott leadership has stated "[b]y educating and empowering our global workforce to say something if they see something, we are not just standing up for the most vulnerable in society, we are also protecting associates and guests as well as living up to a core company value -- serving our world."[20]

59.    Unfortunately, while Marriott's public statements reflect actual knowledge of the problem of sex trafficking and assumption of responsibility to respond to it, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Marriott has continued operating in a way that it knows or should know is facilitating trafficking at its hotels and is deriving revenue from the ongoing sex trafficking at its hotels.

60.    Information that has become public through news stories establishes the entrenched and pervasive nature of Marriott's role in providing a venue where sex trafficking has continued unabated for years. For example:

    a. In 2000, two men were arrested on charges related to operating two separate escort rings operating at a Marriott property in Pennsylvania.[21]

---

[19] https://www.freedomunited.org/news/marriott-hotels-trafficking/?utm_source=google&utm_medium=cpc&utm_campaign=%28ROI%29%20DSA&utm_id=1080780403&utm_content=138149034224&utm_term=&gad_source=1&gclid=CjwKCAjw68K4BhAuEiwAylp3klEN3GWiMOQNXKpIRwRriuMuMA8toYNOnGjVsMDz4GKliri8HF75gxoC8IIQAvD_BwE

[20] *Marriott Has Trained 500,000 Workers to Recognize Human Trafficking Signs*, Hotel Business (Jan. 18, 2019), https://hotelbusiness.com/marriott-has-trained-500000-workers-to-recognize-human-trafficking-signs/.

[21] PROSTITUTION STING ENDS IN ARREST OF PODIATRIST

16

b. In 2009, there were multiple arrests following a bust of a prostitution ring operating out of New York hotels, including two Marriott properties.[22]

c. In 2011, a man trafficked underage girls in hotel rooms in Massachusetts, including a Marriott branded property, leading to his 2013 guilty plea.[23]

d. In 2012, a man was arrested for participating in prostitution of a minor after paying for sex at a Marriott property in North Carolina.[24]

e. In 2013, three were arrested following a prostitution sting at a Marriott property in New Jersey.[25]

f. In 2013 FBI human trafficking sting led to the arrest of a man who was caught pumping prostitutes at a Marriott property in Mississippi.[26]

g. In 2014, two were indicted on sex-trafficking charges after an arrest at a Louisiana Marriott hotel.[27]

---

TROOPERS POSED AS JOHNS AT A W. CONSHOHOCKEN HOTEL. A FEW HOURS LATER, THEY MADE A SIMILAR ARREST THERE *PhiladelphiaInquirer* (April 20, 2000) https://plus.lexis.com/api/permalink/b7d1bb2e-3a5c-4bae-9930-8fe301ab3e0d/?context=1530671

[22] https://abc7ny.com/archive/7055026/

[23] https://www.patriotledger.com/story/news/courts/2013/10/23/dorchester-man-arrested-in-quincy/37936044007/

[24] https://reason.com/2012/03/05/new-mexico-cop-on-paid-leave-while-being/

[25] https://patch.com/new-jersey/bridgewater/report-prostitution-investigation-names-three-in-indictments

[26] https://www.wlbt.com/story/23060304/alleged-pimps-appear-in-rankin-courtroom/

[27] Jury indicts two in sex trafficking crimes *** Pair accused of prostitution women, teenage girl, *The Advocate (Baton Rouge)* (April 29, 2014), https://plus.lexis.com/api/permalink/24d5dc1b-951f-4d2a-9970-e60913dd5cf2/?context=1530671

h.  In 2014, a man was arrested at a Marriott property in Pennsylvania after a woman contacted law enforcement stating she had been held captive at the hotel and exploited by multiple men every day for a week.[28]

i.  In 2014, 14 were arrested after a prostitution sting at a Tennessee area Marriott hotel.[29]

j.  According to a 2017 analysis, Marriott branded hotels were among the most common locations for prostitution busts among Houston area hotels.[30]

k.  In 2017, a man was arrested at a Florida Marriott hotel on trafficking-related charges.[31]

l.  In 2019, a man was convicted on sex-trafficking charges for trafficking multiple women, including at Marriott hotel in New York.[32]

61.  There are many similar articles about sex trafficking and other associated criminal activity at Marriott branded hotels. Moreover, on information and belief, Marriott and Franchisee are aware of additional significant law enforcement activity related to trafficking at Marriott hotels, including the Palmdale Courtyard, that was not reported in the media.

---

[28] https://www.cbsnews.com/philadelphia/news/i-team-investigation-sold-for-sex-a-local-dad-is-facing-shocking-charges/

[29] https://www.jacksonsun.com/story/news/crime/2019/08/19/jackson-madison-county-prostitution-sting-nets-16-arrests-narcotics-drug-weapon-charges/2053639001/

[30] Fernando Alfonso III, Houston's most popular hotels for prostitution busts, CHRON (AUG. 10, 2017), https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popularhotels-for-prostitution-11744958.php?ipid=hpctp#photo-15603057

[31] https://www.palmbeachpost.com/story/news/crime/2017/09/07/latest-greenacres-prostitution-stings-net/7744817007/

[32] https://buffalonews.com/news/local/crime-courts/jury-finds-buffalo-man-guilty-of-sex-trafficking-after-days-of-lurid-testimony/article_f4fe7493-c44a-5768-9679-ce533d9344ae.html

18

62.     Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Marriott branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Hotel frequently and long after the trafficking of the Plaintiff.

63.     Upon information and belief, news stories and reviews establish that, at the time Jane Doe (M.S.H.) was trafficked at the Palmdale Courtyard, Marriott knew at a minimum:

a. The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

c. Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in Marriott branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at Marriott branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

64.     Despite the continually mounting evidence that sex trafficking at Marriott-branded properties was ongoing and growing, Marriott did not change course. Marriott chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**B. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Palmdale Courtyard.**

19

65. Sex trafficking was widespread and pervasive at the Palmdale Courtyard specifically.

66. Defendants knew that traffickers, including Jane Doe (M.S.H.)'s traffickers, repeatedly chose to use the Palmdale Courtyard for their sex trafficking activity. The traffickers selected the Palmdale Courtyard because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Palmdale Courtyard. There were obvious signs of this activity, which were consistent with the "red flags" for sex trafficking that were well known to the hospitality industry, including Marriott and Franchisee. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Palmdale Courtyard based on obvious indicators of this activity.

67. These traffickers, including Jane Doe (M.S.H.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

68. There were other victims being trafficked at the Palmdale Courtyard at the same time as Jane Doe (M.S.H.), and there were obvious signs these victims were being trafficked.

69. The conduct of Marriott and Franchisee facilitated the trafficking of multiple victims by multiple traffickers at the Palmdale Courtyard. Defendants developed a continuous business relationship with these traffickers who operated at the hotel on a routine and repetitive basis.

70. Upon information and belief, there were multiple trafficking victims exploited at the Palmdale Courtyard prior to Jane Doe (M.S.H.)'s trafficking who

exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

71. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

72. All knowledge from the staff at the Palmdale Courtyard is imputed to Franchisee Defendant, which employed the hotel staff. Thus, Franchisee Defendant knew about the widespread and ongoing trafficking at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to Marriott based on the existence of an actual agency relationship as described below.

73. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee learned or should have learned about the obvious signs of widespread trafficking at the Palmdale Courtyard, based on non-public sources of information including but not limited to:

      a. surveillance of the property;

      b. internal investigations;

      c. customer complaints;

      d. monitoring of customer feedback;

e.  information received from law enforcement;

f.  and other sources of non-public information available to Franchisee.

74.  Upon information and belief, Marriott knew or should have known about the widespread trafficking at the Palmdale Courtyard based on:

a.  The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to Marriott;

b.  Marriott's regular monitoring of online reviews;

c.  Marriott's collection and monitoring of customer surveys and complaints;

d.  Marriott's requirement that franchisee submit regular and detailed reports to Marriott about day-to-day hotel operations;

e.  Marriott's collection and monitoring of data about guests at the Palmdale Courtyard, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  Marriott's supervision and control over day-to-day operations of the Palmdale Courtyard through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow Marriott's to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  Marriott's regular inspections of the Palmdale Courtyard;

h.  Marriott's employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  Marriott's access to surveillance and security systems;

j.  Information provided to Marriott by law enforcement; and

k.  Other sources of information available to Marriott.

75. Marriott required Franchisee and hotels staff and management to report suspected criminal activity, including suspected sex trafficking, to Marriott.

76. Based on the obvious "red flags" of the sex trafficking activity at the Palmdale Courtyard, Franchisee and hotel staff and management were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to Marriott prior to Jane Doe (M.S.H.)'s trafficking.

77. Upon information and belief, Marriott observed obvious "red flags" of numerous instances of sex trafficking occurring at the Palmdale Courtyard based on their supervision and monitoring of the property.

**C. Defendants knew Jane Doe (M.S.H.) was being trafficked at the Palmdale Courtyard because of the apparent and obvious "red flags" of sex trafficking.**

78. During the period that Jane Doe (M.S.H.) was trafficked at the Palmdale Courtyard, there were obvious signs that her trafficker was engaged in sex trafficking:

    a. Jane Doe (M.S.H.)'s trafficker worked at the front desk of the subject hotel and told other members of the staff what he was doing.

    b. The hotel rooms in which she was trafficked were frequently paid for by johns with cash or prepaid cards.

    c. Staff always gave Jane Doe (M.S.H.) rooms that were towards the back and easy for johns to come and go.

    d. Upon information and belief, Jane Doe (M.S.H.)'s trafficker bribed hotel staff to allow the trafficking to take place at the Palmdale Courtyard.

    e. Hotel staff observed Jane Doe (M.S.H.) with her trafficker and saw the control he exercised over her as well as the effect on her appearance, demeanor, and behavior, such as fear, anxiety, signs of drug use, and signs of the violence she endured.

f.  The "Do Not Disturb" door hanger was used very frequently.

g.  Housekeeping staff was prevented from entering the room. Jane Doe (M.S.H.)'s trafficker would give her lots of towels and sheets.

h.  Jane Doe (M.S.H.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

i.  There was heavy foot traffic in and out of Jane Doe (M.S.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

j.  After Jane Doe (M.S.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant.

k.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

79.    Based upon information and belief, multiple employees at the Palmdale Courtyard, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

80.    As such, Franchisee knew or were willfully blind to the fact that Jane Doe (M.S.H.) was being trafficked at the Palmdale Courtyard.

81.    Given these obvious signs, Marriott knew or should have known about the trafficking of Jane Doe (M.S.H.) based on its policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

82.    Marriott also knew or should have known about the trafficking of Jane Doe (M.S.H.) based on the numerous tools, further described above, that it used to monitor and supervise the Palmdale Courtyard, which revealed "red flags' of the trafficking activity at the hotel.

24

83. Marriott and Franchisee Defendant had constructive knowledge of the trafficking of Jane Doe (M.S.H.) at the Palmdale Courtyard because that trafficking was the direct result of the Franchisor and Franchisee Defendants facilitating trafficking at the Palmdale Courtyard.

84. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Marriott branded hotels, and at the Palmdale Courtyard, Marriott and Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Palmdale Courtyard and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (M.S.H.)'s trafficking at the Palmdale Courtyard and that they were benefiting from such trafficking.

**IV. Defendants actively facilitated sex trafficking at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.)**

**A. Franchisee facilitated the trafficking activity at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.).**

85. Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of the Palmdale Courtyard when operating these hotels because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of human trafficking occurring in the Palmdale Courtyard.

86. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Palmdale Courtyard, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

87.    Franchisee knew or was willfully blind to the fact that Jane Doe (M.S.H.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (M.S.H.)'s sexual exploitation.

88.    Franchisee continually renewed its business relationship with Jane Doe (M.S.H.)'s trafficker by renting rooms on a recurring basis that it knew or at least should have known were used for trafficking of Jane Doe (M.S.H.). Franchisee was familiar with Jane Doe (M.S.H.)'s trafficker, who was an on-site employee, and repeatedly turned a blind eye to the obvious signs of his illegal activities and created an environment where he could operate efficiently and with minimal risk of disruption or interference. This facilitated the trafficking of Jane Doe (M.S.H.).

89.    Franchisee also facilitated widespread trafficking at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.), in ways including:

a. developing relationships with traffickers, including M.S.H.'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of M.S.H. and other victims;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking education and training for hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking

26

significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

g. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection;

h. accommodating specific requests made by traffickers; and

i. upon information and belief, accepting bribes from traffickers in exchange for assurance that the activity could continue without interference.

90.    Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (M.S.H.).

91.    Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B. Marriott facilitated the trafficking activity at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.).**

92.    Upon information and belief, Marriott participated directly in aspects of the operation of the Palmdale Courtyard that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (M.S.H.), as follows:

a. Publicly assuming responsibility for detecting and preventing human trafficking.

b. Assuming responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to law enforcement and to Marriott.

27

c.  Assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking.

d.  Assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking.

e.  Assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place.

f.  Establishing systems for guests to report criminal activity, including sex trafficking, and hotel security issues to Marriott.

g.  Retaining control over the security of the Palmdale Courtyard through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Palmdale Courtyard.

h.  Retaining control over property-specific data and customer data, including names, payment information, reservation history, browsing data, and other details associated with their stay, from the Palmdale Courtyard—which they obtained by controlling the means and methods by which Franchisee recorded, stored, and reported that data—such that they had actual or constructive knowledge— about the ongoing trafficking that was occurring at the Palmdale Courtyard during the time Plaintiff was trafficked there.

i.  Mandating the specific tools and systems that Franchisee must use to provide Wi-Fi/internet access to guests.

j.  Setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage.

k.  Requiring franchisees to use a system to monitor and track housekeeping requests.

l.  Setting policies for when and how housekeeping services are provided.

28

    m. Collecting and monitoring data that showed patterns of use of housekeeping services.

93. Marriott directly participated in and retained day-to-day control over renting rooms at the Palmdale Courtyard by, among other things:

    a. Controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

    b. Controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

    c. Requiring Franchisee to use its centralized reservation system and preventing Franchisee from using any other system.

    d. Reserving rooms and accept payments without requiring Franchisee's approval or involvement.

    e. Controlling and restricting the ability of Franchisee and staff to refuse or cancel a reservation.

    f. Requiring Franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms.

    g. Requiring Franchisee to use a software system operated and controlled by the franchisor to process payments.

    h. Requiring Franchisee to use a property-management system operated and controlled by the franchisor.

    i. Requiring Franchisee to use a data-management system operated and controlled by Marriott.

    j. Ensuring that data related to each room reservation passes through systems owned, maintained, and managed by Marriott.

k. Controlling the price of rooms.

l. Controlling all details of the customer loyalty program that Franchisee was required to implement, including franchisee reimbursement policies based on occupancy rates.

m. Setting detailed policies for the check-in process, including requirements for identification and payment methods.

n. Collecting guest data, requiring Franchisee to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay.

o. Assuming sole ownership over all guest information.

p. Requiring franchisees to use a system to monitor and track the rental of rooms, walk up reservations, payment method, check-in information gathered and the use of cash and/or pre-paid debit cards on a daily basis for multi-day rentals.

q. Overseeing do not rent (DNR) lists for its branded properties.

94. Marriott had a direct business relationship with traffickers operating at the Palmdale Courtyard because, among other things, the Franchisor directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with Marriott by repeatedly and intentionally choosing to operate at the Palmdale Courtyard because it was known Marriott's policies and practices created a favorable environment for trafficking.

95. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Palmdale Courtyard, Marriott continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (M.S.H.).

96.    Marriott knew or should have known that Jane Doe (M.S.H.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Jane Doe (M.S.H.)'s sexual exploitation.

97.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Palmdale Courtyard, Marriott continued participating in a venture at that hotel, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to the following:

a.    adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b.    providing inadequate training on issues related to human trafficking and unreasonably delaying training;

c.    adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

d.    adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

e.    adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

f.    providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

31

g. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Palmdale Courtyard;

h. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

i. willfully delaying taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

98. If Marriott had exercised reasonable diligence when operating the Palmdale Courtyard and in the areas where it retained control, Marriott would have prevented the Palmdale Courtyard from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (M.S.H.). Instead, Marriott engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (M.S.H.).

99. Jane Doe (M.S.H.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if Marriott had used reasonable diligence in the aspects of hotel operations over which they retained control.

100. Moreover, Jane Doe (M.S.H.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Palmdale Courtyard over an extended period because Marriott adopted policies and practices that insulated Jane Doe (M.S.H.)'s trafficker from significant risk of detection or disruption.

## V.    Defendants' Ventures at the Palmdale Courtyard

101. Marriott generated substantial income from the Palmdale Courtyard, receiving a share of the profits from room rentals collected at the hotel. The fees

generated by Marriott were primarily based on gross room rentals; therefore, Marriott's profits increased with each room rental at the Palmdale Courtyard, including each room rented to a trafficker. Revenue generated from rooms rented at the Subject Palmdale Courtyard was distributed among Marriott, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (M.S.H.)'s trafficker.

102.  Marriott also benefited from sex traffickers' frequent use of the Palmdale Courtyard because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for Marriott, including that this assisted it in obtaining financing and helped it market franchising opportunities to potential franchisees.

103.  Franchisee profited from every room rented to a trafficker or for use in trafficking at the Palmdale Courtyard, both from the room fee and from fees for other hotel services.

104.  In ways described more fully above, the Marriott and Franchisee knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the sex traffickers operating out of the Palmdale Courtyard, including Jane Doe (M.S.H.)'s trafficker. (hereinafter "Venture 1").

105.  Marriott and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the Palmdale Courtyard by continuing to rent rooms to be used for trafficking (including M.S.H.'s trafficking) after Marriott and Franchisee each knew or should have known that the rooms were being used for unlawful trafficking.

106.  This business relationship involved mutual pursuant of financial benefit: the trafficker was renting the hotel rooms to generate revenue from sex

33

trafficking and Marriott and Franchisee were generating revenue by renting the hotel rooms.

107. This implicit understanding developed because sex traffickers, including Jane Doe (M.S.H.)'s, frequently used the Palmdale Courtyard for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of Marriott and Franchisee that created a favorable environment for sex trafficking to flourish.

108. Both Marriott and Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and Marriott played a primary role in renting rooms at the Palmdale Courtyard and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

109. Marriott and Franchisee participated in the venture by continually renting rooms to traffickers, including Jane Doe (M.S.H.)'s, after they knew or should have known that victims like Jane Doe (M.S.H.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Palmdale Courtyard as a venue for their illegal activities.

110. Marriott and Franchisee did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them to "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

a. The population of traffickers, including Jane Doe (M.S.H.)'s, were familiar to the staff at the Palmdale Courtyard;

b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Palmdale Courtyard but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including M.S.H.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

e. The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities.

f. Upon information and belief, staff accepted bribes from traffickers in exchange for an understanding that the trafficking would be allowed to continue.

111. The criminal traffickers operating at the Palmdale Courtyard as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (M.S.H.).

112. If Marriott and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (M.S.H.)'s trafficking at Palmdale Courtyard.

113. In ways described more fully above, Marriott and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Palmdale Courtyard (hereinafter "Venture 2").

35

114.    Marriott and Franchisee had a longstanding business relationship pursuant in which they jointly participated in operation of the Palmdale Courtyard with a shared goal of maximizing revenue, including gross room revenue.

115.    Marriott and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Palmdale Courtyard by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

116.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Palmdale Courtyard, which resulted in Jane Doe (M.S.H.) and other victims being harbored, maintained, and provided in the rooms of the Palmdale Courtyard. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

117.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Marriott and Franchisee participated in the venture by continuing to operate the Palmdale Courtyard in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (M.S.H.). Marriott provided Franchisee with operational support, use of trademarks, marketing services, and other resources to operate the Palmdale Courtyard in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendant and the Staff at the Palmdale Courtyard Acted as Actual Agents of Marriott.

36

118. Marriott is vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the Palmdale Courtyard, which are Marriott's actual agents or subagents.

119. Marriott subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Palmdale Courtyard. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that Marriott imposed through its ongoing control of hotel operations.

120. Marriott obscures the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisor imposed on the franchisees:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions; and

d. significantly exceeded what was necessary for Marriott to protect its registered trademarks.

121. In addition to the ways described above, upon information and belief, Marriott exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the subject properties, including the following ways:

37

a. Requiring Franchisee and hotel management to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Marriott to protect its registered trademarks.

b. Providing training for hotel management and select hotel staff on-site and at locations selected by Marriott.

c. Requiring all hotel staff to participate in training Marriott created through the Digital Learning Platform that Marriott maintains and controls.

d. Controlling training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used.

e. Retaining sole discretion to determine whether all training had been completed satisfactorily.

f. For certain products and services that Franchisee was required to purchase to operate the Palmdale Courtyard, designating approved vendors and prohibiting Franchisee from purchasing goods and services from anyone other than an approved vendor.

g. Requiring Franchisee to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel.

h. Setting required staffing levels for the Palmdale Courtyard.

i. Establishing detailed job descriptions for all positions at the Palmdale Courtyard and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

j. Setting requirements for the hiring process used by Courtyard Franchisee and overseeing employee discipline processes and termination decisions.

k. Providing benefits for employees of franchised hotels.

38

l. Requiring Franchisee to use a customer resource management program maintained and operated by Marriott.

m. Controlling channels for guests to report complaints or provide feedback regarding the Palmdale Courtyard and directly participating in the response and/or supervising and the response to customer complaints or other feedback.

n.  Retaining the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs.

o. Requiring Franchisee to use an application owned, operated, and maintained by Marriott to manage all guest data and information.

p. Requiring Franchisee to provide Marriott with access to the backend of systems used to operate the Courtyard Franchisee such that Marriott had direct and real-time access to information about hotel operations.

q. Regularly auditing the books and records of Franchisee.

r. Conducting frequent and unscheduled inspections of the Palmdale Courtyard.

s. Retaining the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Palmdale Courtyard.

t. Controlling all marketing for the Palmdale Courtyard and prohibiting Franchisee from maintaining any online presence unless specifically reviewed and approved by Marriott.

u. Imposing detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations.

v. Supervising and controlling day-to-day operations of the Palmdale Courtyard through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use.

w. Retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

122. Upon information and belief, Marriott had the right to and did enforce its control over Franchisee Defendant through various methods, including:

a. the right to conduct detailed inspections of the subject property;

b. monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c. directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

123. Marriott is also vicariously liable for Franchisee and the hotel staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (M.S.H.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. Marriott had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

## VII.    Marriott International and MIF are jointly responsible for the trafficking of Jane Doe (M.S.H.)

124.    Upon information and belief, the rights and obligations regarding the operation, franchising, and control of the Palmdale Courtyard were shared and fulfilled jointly by Marriott International and MIF. The terms of the franchising agreement provided that Marriott International and MIF and affiliates would collectively fulfill the responsibilities of franchisor. Upon information and belief, Marriott International and MIF shared revenue related to operation, franchising, and control of the Palmdale Courtyard, and Marriott International and MIF experienced a direct benefit from the rental of rooms to traffickers at the Palmdale Courtyard.

125.    Marriott International and MIF were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture. Marriott International and MIF, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management. They shared office space, employees, management, and policies. Thus, Marriott International and MIF are vicariously liable for the actions of one another regarding the operation, franchising, and control of the Palmdale Courtyard.

126.    Upon information and belief, operation of the subject properties was part of a single unified operation by Marriott International and MIF. Upon information and belief, Marriott International and MIF shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

127. Upon information and belief, Marriott International and MIF acted jointly to own, operate, control, manage, and supervise the Palmdale Courtyard. As an integrated enterprise and/or joint venture, Marriott International and MIF were separately and jointly responsible for compliance with all applicable laws.

**VIII. Defendants are Jointly and Severally Liable for Jane Doe (M.S.H.)'s Damages.**

128. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (M.S.H.).

129. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (M.S.H.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

<u>**CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**</u>

130. Jane Doe (M.S.H.) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee)**

131. Jane Doe (M.S.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

132. Franchisee is a perpetrator within the meaning of 18 U.S.C §1595(a) because it:

    a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (M.S.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

    b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received

financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

133. Violations of 18 U.S.C §1595(a) by the Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (M.S.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

## II. Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants).

134. Jane Doe (M.S.H.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

135. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

136. Venture 1: Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including Jane Doe (M.S.H.)'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Palmdale Courtyard by renting them hotel rooms and

43

providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Palmdale Courtyard to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (M.S.H.).

b.  This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (M.S.H.), in the rooms of the Palmdale Courtyard.

c.  Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d.  Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including M.S.H.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including M.S.H.). Each Defendant received a financial benefit every time a trafficker rented a room.

e.  Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including M.S.H.'s trafficking).

137.  Venture 2: Through acts and omissions more fully described throughout this Complaint, Marriott and Franchisee Defendant each received a financial benefit from participating in Venture 2, a hotel-operating venture operating the Palmdale Courtyard. Marriott and Franchisee violated the TVPRA through participation, as beneficiaries, in Venture 2 as follows:

a.  Venture 2 is a commercial venture that resulted from the business relationship between Marriott and Franchisee to operate the Palmdale Courtyard with a common objective of maximizing revenue at the hotels, including gross room revenue.

44

b. Franchisee participated in this venture by using its on-the-ground role to operate the Palmdale Courtyard in a way that it knew or should have known was facilitating sex trafficking.

c. Marriott participated in this venture by (1) continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel as further described above; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

d. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Palmdale Courtyard, including the trafficking of Jane Doe (M.S.H.). This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C §1591(a) as a perpetrator.

e. Marriott and Franchisee each benefited from participating in Venture 2 as each derived revenue and other benefits from operating the hotel and from each room rented for use in sex trafficking, including the rooms rented for the trafficking of Jane Doe (M.S.H.).

f. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at the Palmdale Courtyard as victims—including Jane Doe (M.S.H.)—were harbored, maintained, provided, and exploited at the Palmdale Courtyard. This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C. §1591(a) as a perpetrator.

g. Marriott and Courtyard Franchisee knew or should have known that this hotel-operating venture was facilitating sex trafficking, including the activities of the traffickers of Jane Doe (M.S.H.)

138. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (M.S.H.).

**III.    Cause of Action: Vicarious Liability for TVPRA Violations (Marriott).**

45

139. Franchisee acted as the actual agents of Marriott when operating the Palmdale Courtyard. The agency relationship between Franchisee and each Marriott lasted for the period during which Marriott was involved in operation of the Palmdale Courtyard through its role as franchisor.

140. Through the acts and omissions described throughout this Complaint, Marriott, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee to operate the Palmdale Courtyard.

141. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

142. As a result of the relationship between Franchisee and Marriott, Marriott is vicariously liable for the acts of Franchisee, including at the Palmdale Courtyard. In addition to the allegations of day-to-day control throughout this Complaint, factors that support this allegation are that Marriott shared profits, standardized employee training, standardized and strict rules of operations, Marriott controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Marriott had the right to terminate any franchisee that failed to comply with the requirements promulgated by Marriott. Thus, Marriott retained control, or the right to control, the mode and manner of work contracted for.

143. As alleged above, Franchisee is directly liable to Jane Doe (M.S.H.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Marriott is vicariously liable to Jane Doe (M.S.H.) for those same violations.

144. Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at

the Palmdale Courtyard, enabled and contributed to the sex trafficking of Jane Doe (M.S.H).

## TOLLING OF LIMITATIONS

145.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (M.S.H.) invokes the discovery rule. At the time she was harmed and through at least 2015, Jane Doe (M.S.H.) was under coercion and control of her trafficker who abused and manipulated her. Thus, Jane Doe (M.S.H.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (M.S.H.)—through no fault of her own—lacked the information to bring a claim because she did not know the legal cause of her injury. This lack of information was a direct result of Jane Doe (M.S.H.) being kept under the control of her trafficker, which Defendants facilitated. She did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

146.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (M.S.H.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (M.S.H.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (M.S.H.) filed this lawsuit.

147.   As a result of her continuous trafficking through at least 2015, Jane Doe (M.S.H.) was beaten, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

148. Jane Doe (M.S.H.) was under the continuous control of her traffickers through at least 2015. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights. She could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

149. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (M.S.H.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, facilitating Jane Doe (M.S.H.)'s trafficking at the Palmdale Courtyard.

150. Jane Doe (M.S.H.) was subject to continuous trafficking at the Palmdale Courtyard through at least 2015, which is not more than 10 years before Jane Doe (M.S.H.) filed this lawsuit.

## **DAMAGES**

151. Defendants' acts and omissions, individually and collectively, caused Jane Doe (M.S.H.) to sustain legal damages.

152. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (M.S.H.).

153. Jane Doe (M.S.H.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future)

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

    f. Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Emotional impairment (until trial and in the future);

j.  Exemplary/Punitive damages;

k.  Attorneys' fees; and

l.  Costs of this action.

m. Pre-judgment and all other interest recoverable.

## JURY TRIAL

154.  Jane Doe (M.S.H.) demands a jury trial on all issues.

## RELIEF SOUGHT

155.  WHEREFORE, Jane Doe (M.S.H.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (M.S.H.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (M.S.H.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

*/s/ C. Moze Cowper*
C. Moze Cowper (CA Bar No. 326614)
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707
mcowper@cowperlaw.com

49

Annie McAdams (*to appear pro hac vice*)
**ANNIE MCADAMS PC**
2900 North Loop West, Suite 1130
Houston, Texas 77092
Tel.: (713) 785-6262
annie@mcadamspc.com

David E. Harris (*to appear pro hac vice*)
**SICO HOELSCHER HARRIS, LLP**
819 N. Upper Broadway
Corpus Christi, Texas 78401
Tel.: (361) 653-3300
dharris@shhlaw.com

Bryan O. Blevins, Jr. | SBN 02487300
**PROVOST ✦ UMPHREY LAW FIRM, L.L.P.**
350 Pine Street, Ste. 1100
Beaumont, TX 77701
Tel.: (409) 835-6000
bblevins@pulf.com

**ATTORNEYS FOR PLAINTIFF**

50